David WATTS, Petitioner–Appellant,

v.

Gary R. McCAUGHTRY, Warden, Respondent–Appellee.

No. 04–1876.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 2004.

Decided Jan. 20, 2005.

Patrick K. Cafferty, Racine, WI, for Petitioner–Appellant.

Peggy A. Lautenschlager, Office of the Attorney General, Madison, WI, for Respondent–Appellee.

Before BAUER, POSNER, and ROVNER, Circuit Judges.

## ORDER

David Watts petitions for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his convictions for sexual assault and kidnapping. He claims that the trial court's exclusion of DNA evidence violated his rights under the Sixth Amendment's confrontation clause. The district court denied the petition, and we affirm.

After a four-day jury trial, Watts was convicted on October 18, 1996 of one count of kidnapping and five counts of first-degree sexual assault. The convictions stem from events that occurred in Greendale, Wisconsin on the evening of January 20, 1996. According to the nineteen-year-old complainant, Jennifer T., she closed the store where she worked at the Southridge Shopping Center at 9:30 p.m. and walked to her car in the mall parking lot. She sat in her car while waiting for it to warm up, and opened the driver's side window a few inches to smoke a cigarette. A man in a truck, whom she later identified as Watts, pulled into the space next to her. Soon after, he reached through the window and grabbed her by the hair. Jennifer began to scream, but Watts told her to keep quiet and hit her in the face. He also warned her that he had a gun. In attempting to roll up the window, she inadvertently rolled the window down further, creating more room for Watts to reach into the car. At this point, Watts pulled open her shirt and began to fondle her breasts. Then, Watts pulled Jennifer out of her car and threw her into his truck. Holding her down, Watts drove away from the mall parking lot and pulled into the back of a small parking lot near a gas station. During the drive, Watts asked Jennifer a number of questions about her sexual history. After parking the truck, Watts forced Jennifer to touch herself, inserted one of his own fingers into her vagina, forced her to touch his penis, and forced her to perform fellatio. Watts later ejaculated while masturbating, though Jennifer was unclear as to whether any semen may have gotten onto her clothing or whether it was only on Watts' clothing. Watts then told Jennifer to get dressed and to get out of the truck. As Watts drove away, Jennifer saw the license plate on the back of his truck. She ran to the nearby gas station and reported the assault to the clerk.

The clerk, Kari Albanese, testified that Jennifer was crying and upset when she came into the station at about 10:30 p.m. Albanese also stated that Jennifer had a bloody nose and mussed hair. Jennifer told Albanese that she had been sexually assaulted and asked Albanese to call 911. Albanese had to write down the license plate number of Watts' truck because Jennifer was so shaken that she could not write legibly. Jennifer also informed Albanese that her car was still running in the mall parking lot, with the driver's side door open and her purse lying on the front seat.

Responding to the 911 call, Officer Ron Ostrowski went to the mall parking lot and found Jennifer's car with the motor run-

ning, driver's side door open, and her purse on the front seat. Meanwhile, Sergeant William Young went to the gas station and reported that Jennifer was visibly shaken and frightened. Soon after obtaining a description of Watts' truck and its license plate number, Young spotted the truck in a nearby apartment complex parking lot. Young found Watts asleep at his fiancée's apartment and arrested him.

Not surprisingly, Watts' account of what occurred that night is quite different. On the day in question, he worked from 5:30 a.m. to 3:30 p.m. at a Baker's Square restaurant near the Southridge mall. After work, he bought a case of beer and drank it by 8:00 p.m. He decided he could make money by helping motorists who were stranded in the snow, so he bought a second case of beer and drove to the mall parking lot, where he assisted several motorists and consumed several more beers. (Meteorological records show that no snow fell in the area on January 20, 1996, and that the snow depth on the ground was zero.) Watts was preparing to go home when Jennifer flagged him down and asked for a ride to buy cigarettes. He asked her why she needed a ride if her car was running, and she said that she sometimes had car trouble. He claims that while talking to her, she reached towards him with an object and something "stuck" him in the finger. He grabbed her by the shoulder, neck, and hair and asked her what was going on, but she assured him that everything was fine. Jennifer then opened the car door, hitting him in the leg. Despite these actions by Jennifer, Watts decided to give her a ride. He drove Jennifer to the gas station, where she offered him sex in exchange for money. She also began to touch herself and act provocatively so as to entice him to accept her offer. Watts declined her proposition and ordered her out of his truck. He denies

threatening or hitting Jennifer, and denies sexually assaulting her in any manner.

As a part of the investigation of this case, Jennifer's clothing was taken into evidence and examined. The examination revealed a small trace of semen that did not come from either Watts or Jennifer's boyfriend. Before the trial, the state filed a motion *in limine* seeking to exclude the evidence of semen from a third party, and the trial court ultimately did exclude the evidence pursuant to Wisconsin's rape shield statute. Instead, a stipulation was read to the jury, stating that Jennifer's clothing was examined by the crime lab and that no trace evidence from Watts was found.

Watts claims that the exclusion of the semen evidence was in error and violated his rights under the confrontation clause of the Sixth Amendment. He asserts that the semen evidence establishes a motive for Jennifer to lie. Under this theory, Watts believes that Jennifer was afraid that her boyfriend would somehow discover the trace amount of semen on her clothing and thereby learn that she was having a sexual affair with someone else. To prevent this, she flagged Watts down and concocted the sexual assault story as cover. Since Watts filed his habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, governs our review. We may not issue a writ of habeas corpus unless the state court proceedings either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

We need not reach the issue of whether the exclusion of evidence by the state court was in error because any error was harmless at best. *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir.2003). First, Watts was permitted to argue that his semen was not found on Jennifer's clothing, which supports his claim that he did not sexually assault her and contradicts any claim by Jennifer that he may have ejaculated on her. Second, Watts' theory that Jennifer fabricated her story as a means of covering up a sexual liaison with a man other than her boyfriend is not credible. Finally, Watts' entire version of the events of the evening is utterly implausible, while compelling circumstantial evidence supports Jennifer's story. Watts claims that he was helping motorists stranded in the snow, but records show that no snow fell that day. Watts claims that Jennifer went with him voluntarily, but she left her car running, with the door open and her purse on the front seat. According to both Kari Albanese and Sergeant Young, Jennifer was visibly shaken and upset. Last but not least, by his own count, Watts consumed roughly thirty-six beers over the course of the afternoon. If so, he is consequently an unreliable source of information regarding the events of that evening.

We therefore have no trouble concluding that any alleged error regarding the third-party semen evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Aleman*, 320 F.3d at 690. We AFFIRM the judgment of the district court.