IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 44296

| STATE OF IDAHO, | ) | Boise, April 2018 Term |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: November 30, 2018 |
| | ) | |
| v. | ) | Karel A. Lehrman, Clerk |
| | ) | |
| ANTHONY J. ROBINS, JR., | ) | SUBSTITUTE OPINION. THE |
| | ) | COURT'S PRIOR OPINION |
| Defendant-Appellant. | ) | DATED AUGUST 2, 2018, IS |
| _____ | ) | HEREBY WITHDRAWN. |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Samuel A. Hoagland, District Judge.

The judgment of conviction is <u>vacated</u> and the case is <u>remanded</u> for an evidentiary hearing.

Nevin, Benjamin, McKay & Bartlett, LLP, Boise, for appellant. Dennis Benjamin argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

_____

BRODY, Justice.

This appeal arises from the jury conviction of Anthony J. Robins, Jr., for aiding and abetting two first-degree murders and an attempted first-degree murder. While he was incarcerated prior to trial, Robins's cell was searched and handwritten notes he had prepared in anticipation of a meeting with counsel were seized and delivered to the prosecuting attorney. The district court granted Robins partial relief from a violation of his attorney-client privilege but placed the burden on him to object at trial if the State offered evidence or argument arising from the privileged materials. Robins argues that the district court erred in fashioning this remedy and we agree. In light of the circumstances, we vacate his judgment of conviction and remand the case with instructions to hold an evidentiary hearing to determine whether the State can overcome the presumption of prejudice arising from its violation of Robins's attorney-client

privilege. If the State can overcome the presumption, a new trial should be conducted from which the Ada County Prosecutor's Office should be recused.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Robins was charged with aiding and abetting the first-degree murders of Elliot Bailey and Travone Calloway, and aiding and abetting the attempted first-degree murder of Jeanette Juraska. He was accused of aiding and abetting John Douglas for each count. The district court granted the State's motion to consolidate Robins's case with the criminal case against Douglas due to the cases' common facts, evidence, and witnesses.

Following his arrest in Northern California, Robins was transferred to the Ada County Jail. On May 11, 2015, Scott McKay, Robins's local counsel, delivered discovery files to the jail so that Robins could have access to the materials while he was detained. Jail personnel informed McKay that the files could not be stored in Robins's cell because of the large number of documents, but that they could be securely stored in the jail library and made available for Robins's review. When the files were delivered, McKay informed Robins that his lead counsel, Brian McMonagle, would be traveling to Boise soon to meet with Robins, and that he should prepare for the meeting by taking notes and identifying matters of discussion related to his review of the files. On May 12, 2015, Robins received permission from the jail to review the files and took notes in anticipation of his meeting with McMonagle. On May 14, 2015, upon direction from Ada County Deputy Prosecutor Shelley Akamatsu, Robins's cell was searched by jail personnel, during which these notes were seized.

The search of Robins's cell arose from information received by the Ada County Prosecutor's Office that an inmate unaffiliated with this case possessed a letter from Douglas to Robins that outlined an attempt to coordinate stories and minimize Robins's culpability for the murders. The Prosecutor's Office was informed by the inmate's counsel that his client intended to use the letter to broker a deal in his own pending case. Shortly thereafter, Akamatsu spoke with Ada County Sheriff's Office Sergeant Justin Ivie and directed him to locate a letter fitting this description. In turn, Sergeant Ivie instructed Ada County Sheriff's Office Deputies Cory Brooks and Timothy Roller to conduct a search of the unaffiliated inmate's cell to find the letter. That search did not produce the letter.

After sharing the news with Akamatsu, Sergeant Ivie received approval from the prosecuting attorney to search Robins's and Douglas's cells. Akamatsu raised the issue of

attorney-client privilege with respect to the search of the unaffiliated inmate's cell but did not address the same concern with respect to the latter two searches. Thereafter, upon an order from Sergeant Ivie, Deputies Brooks and Roller conducted a search of Robins's cell. The deputies were once more instructed to locate the letter from Douglas to Robins that the unaffiliated inmate had claimed to possess.

During the search of Robins's cell, Deputy Roller found four pieces of lined paper consisting of six pages of handwritten notes in Robins's property bin. These notes were later shown to be those that Robins made on May 12th during his review of the discovery files. In examining the notes for the purpose of their search, the deputies recognized that their contents referred to Robins's and Douglas's cases and trial. The deputies testified that the notes were not in the form of a typical legal document—i.e., they were not typewritten, on letterhead, in a legal document, marked as "legal," stamped by an attorney, or in an envelope. They were, however, found in Robins's property bin, which was where inmates were expected to keep their privileged materials. The deputies also recognized that the notes were not in the form of a letter, as they did not include names or salutations. Nonetheless, under the belief that they were the objective of their search and not privileged legal documents, the deputies delivered the notes to Sergeant Ivie. The notes were then booked into evidence by Sergeant Ivie. At that time, he also notified Akamatsu, who in turn stated that the seized materials sounded promising and that she had an interest in seeing their contents. In response, Sergeant Ivie scanned the notes and emailed a copy to Akamatsu. Later that day, Akamatsu emailed a copy of the scanned notes to McMonagle and informed him that they had been found during a search of Robins's cell and booked into evidence.

After the search of Robins's cell, the deputies searched Douglas's cell, which resulted in the seizure of notes and a lined notebook that were also delivered to Sergeant Ivie and eventually Akamatsu. The next day, the unaffiliated inmate's attorney visited the Prosecutor's Office and turned over a letter that had been given to him by his client. This letter was revealed to be the true objective of the searches the day before.

Following these events, Robins filed a motion for order to show cause and for other relief from the State's violation of his attorney-client privilege. In the motion, Robins asserted that the notes contained privileged content and requested the dismissal of the pending charges or, in the alternative, an order recusing the Ada County Prosecutor's Office. In addition, Robins requested

the return of the privileged materials without the State's retention of copies, the prohibition of the State from making any evidentiary use of its review of the materials, the requirement of the State to demonstrate in advance of trial that any evidence it intended to offer originated independently of the privileged materials, and the prohibition of the State from seizing and reviewing other privileged materials.

Before the district court considered this motion, Robins also moved for relief from prejudicial joinder and sought to have his trial severed from Douglas's trial. The basis for this second motion was that severance was necessary to protect his Sixth Amendment rights because the letter written by Douglas (and turned over to the prosecuting attorney by the unaffiliated inmate) was inadmissible against him.

On September 23, 2015, about four months after the notes were seized, the district court held an evidentiary hearing, at which Sergeant Ivie and Deputies Brooks and Roller were presented for testimony. During this hearing, the seized notes were admitted as a sealed exhibit. On September 30, 2015, after the district court reviewed the notes, it ordered the State to turn over all of its copies and any materials derived therefrom until it could issue a final decision on the pending motions. The State complied. On October 23, 2015, the district court issued a memorandum decision granting Robins's motion for order to show cause and for other relief in part. The district court also denied Robins's motion to sever.

A jury ultimately found Robins guilty of all three counts against him. The letter intercepted by the unaffiliated inmate was admitted at trial over Robins's objections. Robins was sentenced to two concurrent life sentences, with forty years fixed, for the convictions of aiding and abetting first-degree murder and a concurrent fifteen-year fixed sentence for the conviction of aiding and abetting attempted first-degree murder. He timely appealed from the judgment of conviction.

## II. ANALYSIS

Robins challenges the district court's decisions on two pretrial motions for relief. We will consider each of these decisions in turn.

### A. Motion for Relief from the State's Violation of Attorney-Client Privilege

Robins contends that the district court erroneously required him to meet an initial burden at trial to show that he was prejudiced by the State's presentation of evidence or argument gained from its intrusion into his constitutional right to counsel. In response, the State argues that

Robins is not entitled to any relief because he has failed to identify the actual prejudice he suffered as a result of the State's acquisition of his notes. "When an appellant asserts the violation of a constitutional right, we give deference to the trial court's factual findings unless those findings are clearly erroneous." *State v. Dunlap*, 155 Idaho 345, 361, 313 P.3d 1, 17 (2013) (quoting *State v. Pearce*, 146 Idaho 241, 248, 192 P.3d 1065, 1072 (2008)). "We exercise free review over the trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found." *Id.*

The Legislature's codification of the attorney-client privilege provides that "[a]n attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment." I.C. § 9-203(2); *State v. Iwakiri*, 106 Idaho 618, 621, 682 P.2d 571, 574 (1984). The privilege is further defined under Idaho Rule of Evidence 502, which states:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client which were made . . . between the client or the client's representative and the client's lawyer or the lawyer's representative.

I.R.E. 502(b). The privilege set forth by Rule 502 applies in "all actions, cases and proceedings in the courts of the State of Idaho and all actions, cases and proceedings to which rules of evidence are applicable." I.R.E. 101(b). For the privilege to apply, "the communication must be confidential within the meaning of the rule and made between persons described in the rule for the purposes of rendering legal advice." *Farr v. Mischler*, 129 Idaho 201, 207, 923 P.2d 446, 452 (1996).

Government intrusion of the attorney-client privilege can implicate an accused's constitutional rights to assistance of counsel and due process. *Stuart v. State*, 118 Idaho 932, 934–35, 801 P.2d 1283, 1285–86 (1990) (citing *Weatherford v. Bursey*, 429 U.S. 545 (1977), and *Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951), *cert. denied*, 342 U.S. 926 (1952)). The right to assistance of counsel is preserved under the Sixth Amendment of the U.S. Constitution. U.S. Const. amend. VI, XIV; *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963); *see also* Idaho Const. art. I, § 13. This right is considered so fundamental that it has been recognized as "the right to *effective* assistance of counsel." *Stuart*, 118 Idaho at 934–35, 801 P.2d at 1285–86 (citing *McMann v. Richardson*, 397 U.S. 759 (1970)). It cannot be disregarded by the states. *Id.* at 935, 801 P.2d at 1286 (citing *Reece v. Georgia*, 350 U.S. 85 (1955)). Encompassed within this right is

the constitutional protection of attorney-client conversations: "A defendant and his attorney must be afforded the opportunity to discuss freely and confidentially." *Id.* "One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard." *Weatherford*, 429 U.S. at 554 n.4.

The importance of this protection notwithstanding, a defendant's constitutional right to counsel is only violated when it is shown that substantial prejudice was caused by the State's intrusion into or interference with the confidential attorney-client relationship. *State v. Martinez*, 102 Idaho 875, 879, 643 P.2d 555, 559 (Ct. App. 1982) (citing *United States v. Irwin*, 612 F.2d 1182 (9th Cir. 1980)); *see also Williams v. Woodford*, 384 F.3d 567, 584–85 (9th Cir. 2004). In *Irwin*, the Ninth Circuit expanded on this required showing of prejudice:

> [M]ere government intrusion into the attorney-client relationship, although not condoned by the court, is not of itself violative of the Sixth Amendment right to counsel. Rather, the right is only violated when the intrusion substantially prejudices the defendant. Prejudice can manifest itself in several ways. It results when evidence gained through the interference is used against the defendant at trial. It also can result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial.

612 F.2d at 1186–87 (footnotes omitted).

In its consideration of Robins's motion, the district court found that the notes contained information about a potential alibi, potential discovery responses, and questions for counsel. The district court next examined the circumstances surrounding the notes—namely, their creation by Robins at the direction of his counsel and his effort to maintain their confidentiality by placing them in his personal property bin, albeit without clear indication that they were privileged—and concluded that they constituted confidential communications that were intended to facilitate defense counsel's legal representation. Particularly, the district court described, "[t]he notes at issue deal with Robins' thoughts and commentary regarding some very specific facts of the case. It is fair to say that the State has been forewarned as to potential defense strategies."

Given the nature of the notes, the district court found that Robins may have been prejudiced because the State had an "inside look" as to how he viewed the case and his defense. Because the notes were confidential and, if admitted, prejudicial, the district court held that the notes would be inadmissible at trial under Idaho Rule of Evidence 502 or, if necessary, Rule of

6

Evidence 403. In turn, the district court reaffirmed its earlier order requiring the State to return all copies of the notes and any prepared materials deriving from the notes. From there, the district court recognized that the return of the notes did not erase the memory of their contents, but that it was impossible to determine whether there would ever be any actual prejudice to the defendant. Thus, the district court distinguished *potential* prejudice from *actual* prejudice, finding that the State's access to Robins's defense strategies constituted potential prejudice but that actual prejudice would only be realized at trial. Referencing the State's assertions that the notes did not contain anything it did not already know and that it was prepared to identify an independent source for each piece of information included within the notes, the district court denied Robins's separate requests for dismissal and recusal. The district court granted the motion to the extent that it held the notes were inadmissible and that the State could not utilize or refer to the notes in any way during trial absent Robins's opening of the door. The district court concluded by explaining that if Robins believed at trial that the State was offering evidence or argument that could only have been obtained from the notes, he could object and the State would then be required to demonstrate an independent source. At trial, no objections of this kind were made.

On appeal, the parties do not dispute the contents of the notes, nor do they dispute the district court's conclusion that the notes were privileged. Instead, they focus entirely on whether the district court's remedy properly appreciated the nature of Robins's requirement to show that he was prejudiced by the State's intrusion on his attorney-client relationship.

The State points us to the decisions in *Stuart v. State*, 118 Idaho 932, 801 P.2d 1283 (1990), and *State v. Martinez*, 102 Idaho 875, 643 P.2d 555 (Ct. App. 1982), contending that the outcomes in those cases were comparable to the district court's remedy here. Robins disagrees, claiming neither decision dealt with the specific form of the State's intrusion at issue in this case.

*Stuart* and *Martinez* involved possible recording of an incarcerated defendant's communications with his attorney. In *Martinez*, the Court of Appeals held that the defendant failed to show that the State's intrusion caused him substantial prejudice. 102 Idaho at 879, 643 P.2d at 559. This holding was based on the fact that neither the defendant nor his attorney nor anyone at the sheriff's office testified as to the substance of the recorded communications. *Id.* Without such testimony and given the fact that the attorney involved was not even the

7

defendant's trial counsel, the court explained that it would not assume that those communications included discussion of trial strategy much less prejudiced the defendant. *Id.*

In *Stuart*, this Court distinguished the case at hand from *Martinez* because both the defendant and his counsel testified as to the content of the conversations that were claimed to have been recorded by jail personnel. 118 Idaho at 934, 801 P.2d at 1285. The case was remanded to the trial court for an evidentiary hearing to determine whether the conversations had actually been recorded, and, if so, whether the defendant's constitutional rights were violated. *Id.* at 935, 801 P.2d at 1286. The Court explained that inquiry into the second issue would require the State to demonstrate an independent origin for the relevant evidence. *Id.* The particular evidence at issue was the names and locations of various witnesses who were subsequently called to testify at trial by the State. *Id.* at 934, 801 P. 2d at 1285. A later appeal from the same case revealed that the conversations had been recorded but that the State established that the defendant's constitutional rights had not been violated. *Stuart v. State*, 136 Idaho 490, 492, 36 P.3d 1278, 1280 (2001).

If anything, this case is a logical extension from the *Stuart* case history. Here, the district court found that the contents of Robins's notes were privileged and that the State obtained access to those notes. Under one interpretation of the *Stuart* decisions, this constituted a prima facie showing of prejudice, at which point the State should have been required to establish that Robins's constitutional right to counsel had not been violated. This calculus was not employed by the district court despite it being part of the relief requested by Robins. On the other hand, the argument against a straightforward application of this analysis to the case at hand is that the *Stuart* decisions acknowledge that the defendant had identified specific evidence—i.e., names and locations of witnesses that were called to testify by the State—that could have been drawn solely from his privileged conversations with counsel. This counterargument matches the State's general contention that Robins has not established that he was prejudiced because he has not offered any specificity regarding the evidence that the State acquired with its access to his notes. Finding that *Stuart* stands for the rule that a shifting of the burden must be implemented where the defendant has made a prima facie showing of prejudice, the issue turns to how such a showing can be made.

To this point, Robins relies on a case—*United States v. Danielson*, 325 F.3d 1054 (9th Cir. 2003)—that proves useful for understanding the nature of establishing prejudice where the

government has acquired knowledge of defense strategies. *Danielson* involved a government informant who acted affirmatively to acquire information during conversations with the defendant that was later shared with law enforcement and the prosecution team. 325 F.3d at 1068–69. Specifically, the informant acquired information regarding the defendant's trial strategy. *Id.* As such, the court sought to answer "what constitutes 'substantial prejudice' and who bears the burden of proof when an improper intrusion into the attorney-client relationship results in the prosecution's obtaining information about the defendant's trial strategy." *Id.* at 1069–70. Although the facts of *Danielson* do not perfectly translate to this case, the analysis and rule adopted by the Ninth Circuit seamlessly complement this Court's *Stuart* precedent.

The *Danielson* court distinguished the prosecution's access to defense strategies from its access to a particular piece of evidence or statement, and explained that the more amorphous nature of strategies meant that the question of prejudice was more subtle and that it would be hard to ever know whether the defendant suffered prejudice. *Id.* at 1070. The court added that in situations of this kind there exists a knowledge imbalance where only the prosecution will ever know what it did and why, while the defendant can only guess. *Id.* Given these conditions, the court discussed the difficulty a defendant faces in showing prejudice when the prosecution has access to his trial strategy:

> The prosecution makes a host of discretionary and judgmental decisions in preparing its case. It would be virtually impossible for an appellant or a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions.

*Id.* at 1071 (quoting *Briggs v. Goodwin*, 698 F.2d 486, 494 (D.C. Cir. 1983)).

To combat these problems, the court implemented a burden-shifting rule for establishing prejudice when intrusion into the attorney-client relationship leads to the government obtaining trial and defense strategies. First, the defendant must make a prima facie showing of prejudice by establishing that the government acted affirmatively to intrude into the attorney-client relationship to obtain the privileged information. *Id.* In the informant context, the court explained that it would not be enough that a government informant was involuntarily present and passively received privileged information. *Id.* (relying on precedent involving an undercover and passive government informant, *Weatherford v. Bursey*, 429 U.S. 545 (1977)). Second, once the prima facie case has been established, the burden shifts to the government to show that there has been no prejudice to the defendant. *Id.* (citing *United States v. Mastroianni*, 749 F.2d 900, 907–08 (1st

9

Cir. 1984)). With regard to the second step, the court looked to the decision in *Kastigar v. United States*, 406 U.S. 441, 460–62 (1972), to explain how the government is to meet their "heavy burden" of showing non-use after a defendant has made the requisite prima facie showing:

> [T]he mere assertion by the government of "the integrity and good faith of the prosecuting authorities" is not enough. Rather, the government must present evidence, and must show by a preponderance of that evidence, that "all of the evidence it proposes to use," and all of its trial strategy, were "derived from legitimate independent sources." In the absence of such an evidentiary showing by the government, the defendant has suffered prejudice.

*Danielson*, 325 F.3d at 1072 (citations omitted).

Thus, the *Danielson* court created a framework for what is now known in federal courts as *Kastigar* hearings. These hearings are conducted pretrial, during trial, or post-trial, and allow the Government an opportunity to bear its heavy burden of proving an independent source for all its evidence and trial strategies apart from any tainted evidence it may have obtained. *In re Grand Jury Subpoena*, 119 F.3d 750, 751 (9th Cir. 1997) (citing *In re Grand Jury Subpoena (Huntington Beach Police Officers Ass'n)*, 75 F.3d 446, 448 (9th Cir. 1996)) (discussing a Fifth Amendment violation). The trial judge makes specific factual findings of the independent nature of the Government's evidence or trial strategies and thereafter provides an appropriate remedy if the Government fails to prove by a preponderance of the evidence an independent source— suppression may be granted pre-trial, and harmless error may be applied post-trial. Yet, a *Kastigar* hearing is not conducted unless a defendant is able to show the possibility of the Government's use of compelled testimony. *U.S. v. Harris*, 973 F.2d 333, 336 (4th Cir. 1992).

The circumstances of this case are slightly different from those in *Danielson* and other federal cases—particularly, the issue does not center on the actions of a government informant or compelled testimony—yet, the sound reasoning undergirding these decisions can be used here to determine whether Robins made a prima facie showing such that the burden should have been shifted to the State to demonstrate that the seizure of the confidential information did not prejudice Robins.

In cases where the *Danielson* analysis has been applied beyond the informant context, courts have focused on the course of events leading to the government intrusion and the exposure of the prosecution team to the privileged content. *See, e.g.*, *Cooper v. Mayfi*, No. C 06-4872 MJJ (PR), 2008 WL 608336, at *13 (N.D. Cal. Mar. 3, 2008); *Navarro v. Adams*, 419 F. Supp. 2d 1196, 1201–04 (C.D. Cal. 2006). For example, in *Cooper*, the court concluded that the prima

10

facie standard was not met in a case involving the seizure of privileged materials from the defendant's jail cell:

> Petitioner, here, has not pointed to any evidence that law enforcement "deliberately" or "affirmatively" intruded into the attorney-client relationship for the purpose of obtaining the defense trial strategy. Detective Daniel served a valid search warrant on petitioner for the sole purpose of an investigation of threats to potential witnesses, not to interfere with petitioner's relationship with his defense counsel. Daniel was not looking for evidence or trial strategy regarding the pending murder charge on the behalf of the prosecution. In addition, the prosecutor filed a declaration stating that he had not seen the material seized from petitioner's cell, and that Daniel, the detective who conducted the search, assured the prosecutor that the search was conducted "in a fashion which respected attorney-client privilege." Therefore, under the governing federal law set forth in *Danielson*, the state courts properly found that the petitioner had the burden to show prejudice, and that such burden did not shift to the prosecution.

*Cooper*, 2008 WL 608336, at *13. The *Navarro* court reached a similar conclusion after considering evidence showing that a jail cell search arising from a prosecutor's request to locate any information on gang activity or witness threats led to the seizure of privileged materials. 419 F. Supp. 2d at 1202–03. The court emphasized that the materials were properly seized and were not shown to the prosecutor but instead delivered directly to the trial judge. *Id.*

The facts here closely follow the facts in *Cooper* and *Navarro* through the search and the initial seizure of privileged materials. Specifically, in this case, jail personnel were instructed to locate a letter that had come into the possession of another inmate that was alleged to have been written by Douglas to Robins. Testimony from the evidentiary hearing indicates that the deputies were aware of possible exposure to material protected by inmates' attorney-client privilege. Robins does not contest the legality of the search on appeal. In short, it seems clear that the search was not conducted for a purpose of intruding on Robins's privilege.

Yet, once the privileged notes were seized from Robins's cell, the facts in this case depart from those in *Cooper* and *Navarro*—namely, the record shows that the notes were delivered to Deputy Prosecutor Akamatsu who, according to the district court, was the first person to identify that they were private and intended for an attorney. At that point, the prosecuting attorney provided a copy of the notes to Robins's counsel and informed him that they had been seized. From there, however, the record does not indicate that Akamatsu took any action to insulate herself from the privileged materials. Rather, the record shows that Akamatsu and the Ada County Prosecutor's Office retained the notes for four months until the district court ordered that

11

all copies be returned to Robins. The record once more fails to establish that Akamatsu was in some way screened from further exposure to the notes throughout this time. In fact, given that Akamatsu argued throughout the proceedings on Robins's motion that the notes were not privileged because they were not held out to be confidential communications with counsel it can be presumed that she was not walled off from their contents.

Prosecutorial access to and retention of privileged content was at the center of the government's intrusion in *Danielson*. In that case, the Ninth Circuit continually emphasized that attempts to insulate the prosecution team did not go far enough, noting that the privileged information was ultimately obtained and preserved by members of the team. 325 F.3d at 1073–74. The court also stressed that the prosecution team wrote memoranda about the privileged information and listened to recordings and transcribed transcripts containing the information, and that the lead prosecutor retained most if not all of the information in his private office. *Id.* at 1074.

The Ninth Circuit has explained since *Danielson* that mere communication of defense strategies to the prosecution is sufficient to constitute a violation of the Sixth Amendment. *United States v. Fernandez*, 388 F.3d 1199, 1240 (9th Cir. 2004) (citing *Danielson*, 325 F.3d at 1067). That being the case, courts applying the *Danielson* analysis have highlighted prosecutorial conduct in a manner that shows concern about such retention and engagement with privileged content. *E.g.*, *United States v. Young*, No. 3:13-cr-00764-WHO-1, 2017 WL 930775, at *4–5 (N.D. Cal. Mar. 9, 2017) (finding no showing of substantial prejudice because the prosecution team was effectively insulated from privileged content); *United States v. Guzman-Solis*, No. CR-14-01729-001-TUC-CKJ, 2015 WL 13283396, at *8 (D. Ariz. Oct. 19, 2015) ("[H]ere, in contrast to *Danielson*, there is no evidence that the tape recorded conversation was listened to by the prosecution or that the prosecution otherwise acquired knowledge of the contents of the privileged conversation."); *People v. Ervine*, 220 P.3d 820, 838–40 (Cal. 2009) (finding burden not met where evidence established that no privileged information had been communicated to the prosecution team following a jail cell search). Outside of *Danielson*, some courts have held that the prosecution's access to trial and defense strategies required a presumption of prejudice. *E.g.*, *United States v. Levy*, 577 F.2d 200, 210 (3rd Cir. 1978) (applying a presumption of prejudice where the prosecutor became privy to trial strategy); *State v. Lenarz*, 22 A.3d 536, 542, 548–49 (Conn. 2011) (holding that a presumption of prejudice must apply when the prosecution itself

learns of confidential communications containing trial strategy given that disclosure of such information is inherently prejudicial); *State v. Cory*, 382 P.2d 1019, 1022–23 (Wash. 1963) (applying a presumption of prejudice where the prosecutor was assumed to have been aware of privileged strategy).

An overarching theme of these decisions is that the prosecution's intrusion into the privileged strategic communications between a client and his attorney weakens the essential and demanding protections inherent in the constitutional right to counsel and undermines the balance necessary in our society's adversarial system of justice. Such reasoning resonates strongly. The record here shows that the prosecuting attorney had prolonged access to privileged notes that included at least some of Robins's possible trial and defense strategies. While there are not clear answers as to if and how the prosecution's access and retention led to specific outcomes that were prejudicial to Robins at trial, this uncertainty is precisely the problem when the privileged communications at issue consist of the defendant's plans and strategies. Given the protections underlying the attorney-client privilege and the constitutional right to counsel, we hold that the circumstances here were sufficient to conclude that Robins satisfied a prima facie showing of prejudice. That being the case, the burden should have shifted to the State to show that Robins's rights had not been violated. The State asserted in response to Robins's motion that it had the ability to satisfy this burden by showing an independent origin for its evidence and argument. The district court even recognized the State's claim in its ruling. Yet, this ability was never tested as the burden was never shifted. This constitutes error.

Because this appeal arises from Robins's judgment of conviction, our finding that the district court did not properly address Robins's prima facie showing of the violation of his constitutional right requires us to vacate that judgment and the corresponding sentence. There remains a difficult question as to how to proceed now that a trial has occurred.

Robins argues that this Court should dismiss the charges against him because prejudice resulting from an invasion of his attorney-client privilege cannot be removed, isolated, or avoided in a new trial. As an alternative, Robins seeks a new trial with the recusal of the Ada County Prosecutor's Office and the requirement on the new prosecuting attorney to present proof that every piece of evidence and strategic decision has an independent origin. The State responds that dismissal is unwarranted because it is not tailored to the specific harm at issue and that

retrial is the appropriate remedy in cases involving government intrusion into the attorney-client relationship.

The U.S. Supreme Court has explained that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1980). The facts of *Morrison* are distinct from those at hand but the general rule described by the Supreme Court offers useful guidance in our effort to ascertain the appropriate remedy for this case.

For support of his request for dismissal, Robins asks us to consider a similar outcome in *State v. Cory*, 382 P.2d 1019 (Wash. 1963). The facts of that case certainly echo many of those that are at issue here. In *Cory*, the Washington Supreme Court dismissed a case after conducting a post-trial review of the denial of a pretrial motion to dismiss based on a violation of the defendant's right to counsel. 382 P.2d at 1019. The motion arose from the sheriff's office's eavesdropping on the defendant's conversations with counsel while he was incarcerated. *Id.* at 1019–20. Upon investigation by the trial court, the recordings were discovered and it was presumed by the court that the prosecutor had been privy to their contents. *Id.* at 1020, 1022 n.3. Despite this, and akin to the case here, the court denied the motion, but informed the parties that it would exclude any evidence derived through the eavesdropping on motion of the defendant at trial. *Id.* at 1020. Following the defendant's conviction, the appellate court considered remedies fashioned by other courts where a defendant's constitutional rights had been violated through eavesdropping on the attorney-client relationship. *Id.* at 1020–22. In so doing, the court reached its conclusion that a new trial would not sufficiently remedy the problem because the prejudicial taint could never be removed from the prosecution:

> There is no way to isolate the prejudice resulting from an eavesdropping activity, such as this. If the prosecution gained information which aided it in the preparation of its case, that information would be as available in the second trial as in the first. If the defendant's right to private consultation has been interfered with once, that interference is as applicable to a second trial as to the first. And if the investigating officers and the prosecution know that the most severe consequence which can follow from their violation of one of the most valuable rights of a defendant, is that they will have to try the case twice, it can hardly be supposed that they will be seriously deterred from indulging in this very simple and convenient method of obtaining evidence and knowledge of the defendant's trial strategy.

*Id.* at 1022–23 (footnote omitted).

Robins correctly notes that Idaho courts have cited *Cory*; however, such citations are relatively insignificant as they pertain to resolution of this case. *State v. Martinez*, 102 Idaho 875, 879, 643 P.2d 555, 559 (Ct. App. 1982) (finding the outcome in *Cory* to be inapposite of the case at hand because there was no evidence that the State had obtained access to privileged trial strategy); *see also Stuart v. State*, 118 Idaho 932, 935, 801 P.2d 1283, 1286 (1990) (using *Cory* for general rule statements regarding the right to counsel). Unlike in those cases, the posture of this case is nearly identical to the one presented in the *Cory* decision. That said, the nature of the *Cory* holding intimates that the court considered as unrebuttable any presumption of prejudice arising from the state's intrusion into the attorney-client relationship. Since *Cory*, the Washington Supreme Court has examined this specific issue and concluded that the presumption can in fact be overcome if the state proves beyond a reasonable doubt that the defendant was not prejudiced before or during the trial by tainted evidence. *State v. Peña Fuentes*, 318 P.3d 257, 262 (Wash. 2014).

As explained above, in *Stuart*, this Court encountered this issue and impliedly recognized that the presumption of prejudice is rebuttable by affording the State an opportunity to establish the existence of an independent origin of the relevant evidence. 118 Idaho at 935, 801 P.2d at 1286. This remedy is consistent with other courts that have dealt with situations of this kind. Most notably, remanding the case for a *Kastigar*-type hearing to determine whether the government could establish an independent origin was the precise remedy the Ninth Circuit settled upon in *Danielson*. 325 F.3d at 1074; *see also Schillinger v. Haworth*, 70 F.3d 1132, 1142–43 (10th Cir. 1995) (remanding for "factfinding procedures to determine the extent of the intrusion as well as the proper remedy"). In both *Stuart* and *Danielson*, remanding the case for a *Kastigar* hearing could be tied to a previously denied post-trial filing of the defendant. 118 Idaho at 933, 801 P.2d at 1284 (petition for post-conviction relief); 325 F.3d at 1065 (post-trial motion for a new trial). Because Robins appealed directly from his judgment of conviction, returning this action to the district court is procedurally distinct. Even so, we believe such a remedy is appropriate.

This case suffered from an improper pretrial remedy. It bears emphasizing that the impropriety of that remedy cut both ways. By not shifting the burden to the State, the district court failed to recognize the violation of Robins's constitutional right to counsel as defined by the presumption of prejudice we have found he established. Yet, by not shifting the burden, the

remedy also denied the State its chance to prove that such a violation did not in fact occur. Given that the State has consistently asserted that it had an ability to establish an independent origin for all of its evidence and argument, the double-edged nature of the improper remedy is significant. We recognized above that Robins made a prima facie showing of prejudice. We now also recognize that such a showing remained rebuttable and the State should have been afforded this opportunity.

The difficulty inherent in remanding this case for an evidentiary hearing to determine whether the State can rebut the presumption is not treated lightly. Nonetheless, we find this necessary, as the record before the Court leaves us unable to determine whether the State could meet this burden. The district court found that Robins's notes contained privileged defense strategy. On appeal, Robins lays out how the information contained in those notes translated to the parties' arguments at trial, thus intending to imply that the State's access to the notes necessarily resulted in its prejudicial use of the same. This advocacy notwithstanding, the State has not yet been challenged to address this specific issue, and therefore we are unable to assess whether Robins's theory holds up when the State bears its burden of proof. The district court is the appropriate forum for that inquiry to be made. While not simple or ideal to return to a pretrial issue now that trial has occurred, this remedy provides both parties an opportunity to consider a narrow question under the circumstances that should have been in place when Robins's motion was first presented.

In remanding the case, we find it prudent to instruct the district court as to the scope of the evidentiary hearing that is to take place. The Ada County Prosecutor's Office is to handle the hearing for the State. Procedurally, at the hearing, the State must prove by a preponderance of the evidence that the evidence it presented at trial and its trial strategy derived from an origin independent of Robins's notes. *See Danielson*, 325 F.3d at 1074 ("Strategy in this context is a broad term that includes, but is not limited to, such things as decisions about the scope and nature of the investigation, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and about what to save for possible rebuttal."). Unlike in *Stuart*, where this Court remanded the action for a similar inquiry and the State was eventually able to show that the defendant had not been prejudiced through use of other exceptions to the exclusionary rule, 136 Idaho 490, 495, 36 P.3d 1278, 1283 (2001), the State has consistently argued here that it was

16

able to satisfy the standard for the independent-origin exception. As such, it will be strictly held to that position. However, if the State fails to meet this heavy burden, the trial judge must determine whether the evidence or trial strategy that was tainted by the illegal evidence affected the substantial rights of the defendant or was merely harmless error. *See* I.C.R. 52. Proof beyond a reasonable doubt is the same standard our appellate courts employ in reviewing for harmless error when a constitutional violation occurred at trial, and therefore proof beyond a reasonable doubt is the standard the State must for a finding of harmless error in using tainted evidence at trial. *State v. Perry*, 150 Idaho 209, 221–22, 227–28, 245 P.3d 961, 973–74, 979–80 (2010) (citing in part *Chapman v. California*, 386 U.S. 18 (1967)).

Should the State fail to prove by a preponderance of the evidence that its evidence and trial strategy had an independent origin and that any use of tainted evidence was beyond a reasonable doubt harmless error, it will be left to the sound discretion of the district court to determine the proper remedy. While we will not preemptively intrude on that discretion, we believe it necessary to impress upon the district court that, under circumstances of this kind, all remedies must be considered available. Any remedy should heed the U.S. Supreme Court's guidance in *Morrison* that deprivations of this nature must be tailored to the injury suffered and the competing interests at stake. Regardless of the specific remedy, complete and permanent elimination of the prejudice arising from the State's intrusion must remain the paramount objective. Given the pervasive depths prejudicial access to defense strategies can reach, merely retrying the case with the recusal of Ada County Prosecutor's Office may not be enough. Greater steps such as the employment of additional, independent counsel assigned solely to ensure that no further prejudice emerges during any subsequent prosecution may prove necessary. Additionally, dismissing the charges should remain an option if the circumstances are such that prejudice arising from the State's prior transgression cannot be completely purged or escaped.

## B. Motion to Sever

Robins's motion to sever his trial from Douglas's centered on the admissibility of the letter that a jailhouse inmate allegedly intercepted from Douglas. The letter read as follows:

> This is how we gonna play this. you get with your Ls tell him you want to cut a deal. But this is what you tell them. Tone ordered 30ps them dudes took the 30ps from tone he called you asked you did you know anybody who wanted to put in some work you called me told me somebody tone wanted to holler at me so tone flew me down there Boise told me what he wanted me to do only reason you and cook was down there was to pick me up and head out to Vegas or somewhere to

party for cooks birthday so when yall got down there we all kicked it for a couple of days. the day of the murder you went where you went and cook went to the strip club when you got back that's when I said ya we out. that's when you said cook had the van keys that's where you called girl to take us to the strip club, you still didn't know what happened at this time we got cook come back you hit girl we packed and left people started hiting you up telling you what happened. that's when you asked me what what's up that's when I told you I bodyed them 2 dudes, now listen this is the story you have to fill in the blanks you tell them everything he said you did you tell them he did once you get back at me and let me know you got the deal you want i will let them know i want to plea out that's when i will back your story about tone was the driver and he gave me money gun everything. Not you. Run this by your Ls and get back with me aint no need both of us going down I already know yall will play yall part because love & loyalty tell your Ls to get at me so we can put this shit in motion A.S.A.P. P.S. or do you want to go with i plea out and you go trial ask me for witness and tell them tone drove the van, gave me the gun and put the hit together, it's your call get with your Ls tell him to come see me or what ever. Let me know wicth way to go. Peace Love Big Homie

Before the district court, Robins argued that the letter was inadmissible hearsay and contended that he would be unfairly prejudiced without the ability to cross-examine Douglas about its contents. The district court agreed that the letter was hearsay, but found that it was admissible against Robins through the hearsay exception for statements against interest under Idaho Rule of Evidence 804(b)(3). In reaching this conclusion, the district court relied on the analysis of *State v. Averett*, 142 Idaho 879, 136 P.3d 350 (Ct. App. 2006). At trial, the letter was admitted in its entirety over Robins's objections.

The district court's denial of Robins's motion to sever is moot at this point given our decision to vacate the judgment of conviction. Because the letter could still play a role in further proceedings of this case, however, we will consider the arguments Robins raises against the district court's decision to admit the letter as evidence.

This Court reviews a trial court's admission of evidence under the abuse of discretion standard. *State v. Ehrlick*, 158 Idaho 900, 907, 354 P.3d 462, 469 (2014). To determine if a trial court abused its discretion, this Court considers whether the trial court (1) perceived the issue as one of discretion, (2) acted within the outer boundaries of that discretion, (3) acted consistently with the legal standards applicable to the specific choices available to it, and (4) reached its decision by an exercise of reason. *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 195 (2018).

On appeal, Robins argues that the district court's application of the law was contrary to governing legal standards. We agree.

Rule 804(b)(3) provides that a statement is not hearsay if the declarant is unavailable and it is

> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid a claim by declarant against another, that a reasonable man in declarant's position would not have made the statement unless declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

I.R.E. 804(b)(3).

In *Williamson v. United States*, 512 U.S. 594, 596–97 (1994), the U.S. Supreme Court considered Federal Rule of Evidence 804(b)(3)—which closely tracks Idaho's rule—as it related to the admissibility of testimony regarding out-of-court statements of a third party that solely implicated the defendant. In so doing, the Court first explained that the hearsay exception was based on "the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Id.* at 599. Yet, inherent in this notion is a narrow definition of "statement" such that the exception "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Id.* at 600–01. This is so because "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." *Id.* at 599. The Court explained further that statements may not be presumed to be self-inculpatory for purposes of the exception solely because they are part of a narrative that constitutes a full confession, and added that this is especially true when the statements implicate another person. *Id.* at 600–01.

Consistent with this guidance, application of Idaho Rule of Evidence 804(b)(3) requires the court to consider each statement included in a broader narrative to determine whether it is in fact genuinely self-inculpatory against the declarant. The Court of Appeals recognized this mandate in *Averett*, where it iterated much of the foregoing analysis and noted that since *Williamson* federal courts have admitted third-party statements that inculpate a defendant only when three conditions are satisfied: (1) the statement must be genuinely self-inculpatory to the declarant, (2) the statement is made to a private person and does not seek to curry the favor of law enforcement authorities, and (3) the statement does not shift blame. *Averett*, 142 Idaho at 890, 136 P.3d at 361 (citing John W. Strong, *McCormick on Evidence* § 319 (5th ed. vol. 2

1999)). Error arose in both *Williamson* and *Averett* because a narrative was admitted in full despite the inclusion of statements within the narrative that solely inculpated the defendant; thus, the first condition was not satisfied because those particular statements were not self-inculpatory to the declarant. Similarly, in this case, the second and third conditions are not disputed, and the issue instead centers on whether particular statements within the letter were self-inculpatory against Douglas as the declarant.

In its ruling, the district court explained that the letter would be hearsay if it was offered to show that Douglas was responsible for committing the underlying murders and Robins was involved in their plotting. Applying Rule 804(b)(3), the district court found that the entire letter was admissible against Robins because it comported with the three conditions set forth in *Averett*:

> Here, the letter is genuinely self-inculpatory as to Mr. Douglas as he places the blame on himself for committing the murders. In fact, no part of the letter seeks to shift the blame to Mr. Robins, but rather seeks to give Mr. Robins an alibi, so that both Defendants do not have to "go down" for the crime. In addition, the letter was meant to be delivered to Mr. Robins, not to law enforcement. Indeed, the context would clearly indicate that Mr. Douglas would not want law enforcement to see it. The letter contains statements that were not intended to be given to law enforcement as a self-serving confession, but rather to another inmate in an attempt to create a story which Mr. Douglas believed would help both Defendants in their cases.

Robins argues on appeal that the district court erred by not individually reviewing the statements within the greater narrative to determine whether each one was against Douglas's interest. His argument is correct. When parsed individually, the only statement in the letter that met the standard described in *Williamson* was the admission that "I bodied them 2 dudes." The remainder of the statements cannot be considered genuinely self-inculpatory to Douglas and therefore they should not have been admitted through Rule 804(b)(3). In *Williamson*, the Supreme Court explicitly rejected the idea that a full narrative could be admitted by including its non-self-inculpatory parts and excluding its clearly self-serving parts. 512 U.S. at 601. This conclusion applies here and the letter should not have been admitted in full against Robins. Finding otherwise disregards the specific nature of the statements in the letter, and in turn undercuts the careful standard that must be employed when applying the hearsay exception.

### III.    CONCLUSION

In consideration of the foregoing, we vacate the judgment of conviction and remand the

case with instructions to hold an evidentiary hearing consistent with this opinion.

Chief Justice BURDICK, Justices HORTON, BEVAN, and Justice Pro Tem MEYER CONCUR.